Good morning, may it please the court. Eric Ochoa for the appellant, Micah Kelly. I'd like to reserve two minutes for rebuttal. There are many aspects to this case, and it's a huge one, but it really comes down to a simple question. Did the DEA do what is required by Congress to temporarily schedule an appellant? Congress delegated unlimited authority and provided very specific procedures under the temporary scheduling statute There are basically three things. The DEA must give notice to GHS. It must consider certain factors and make findings about the substance and why it poses an imminent threat to the public's safety. And it must comply with a 30-day notice requirement. And to which of those did the DEA do not comply with? All of them, your honor. The DEA did not transmit... Because it didn't specify an ethyl halide biocomponent, your honor. Is that the problem? No. That, plus, in the notice, they didn't even mention isores to GHS. And why is that significant? Again, there's only GHS. That's how this, excuse me, framework works. And there's that Congress-specified statute itself. And then, as a result, you have substantially more isores that you want to use to secure you from the isores. So why would GHS need to be told to comply to the DEA? Because the GHS has the medical and scientific expertise to be able to say, hold it. Some of these substances have potential medical uses. Or some of these substances really are advancing scientific research in these categories. This does not belong on the controlled substance statute. And apart from that, the statute itself, in plain language, requires the DEA to give notice. So it lists the substance, what's this called? The benign substance, which is benign, right? Yeah. So there's that. It's due on the kids' office. It's due for a while. And it's not significant. So there's a huge social obesity that you carry with it all the time rather than on the servers. Right. And the GHS knows that that's how the social system is set up. So why, if it's told by the DEA, we're looking at being on the phone with the GHS now, okay, well, if we're going to give any feedback, not only on that one limited substance, but, of course, all of these relevant isomers as well? Because if something has isomers, does it mean that those isomers have anything in common with the substance itself? We can't assume that ethylone is the same as butylone. They're different substances. I'm talking just from a notice standpoint. You said the defect. You started out and said each one of those three, there's a problem with the defect. Okay, and the first one you said is actually, well, DEA didn't tell the GHS that this is good and it was interested in ethylone as well. And I'm saying why would DEA need to tell the GHS that they already know once they were told to be on the phone with the social system looking at it, right? Because if they had these isomers, we might not be here. Had they specified these types of positional isomers, we know what they are, and we know what they do, and they all are dangerous and need to be scheduled. They didn't do it in this case, and I'm confident, having learned more about isomers than I ever have in my life, for this case, I'm confident that had they said, and it's isomers, GHS would not have let that fly. They would have said, what substances are you talking about? What findings have you made? What exactly are we? Why are you so confident about that? Because I'll give the court two examples about isomers that are completely different. One, THC. I'm talking about the basic insecurity case. You said that it's a DNA test, and somehow GHS was like, oh, whoa, whoa, whoa, whoa, dude, we don't know what you're talking about. No, you're right. I'm saying that if the DEA had said ethylone plus its isomers, GHS would have said why isomers be more toxic. That's what I'm saying. Why are you so convinced that that would have happened here? Because the word isomers just captures the universe of so many potential substances. It actually happens every time. It's one of the most toxic ever one. And that's why the DEA has to be specific, and that's why Congress requires the DEA to do certain things. And Congress actually redeems, if you look at the Controlled Substances Act, Congress redeems authority over unnamed isomers. And we know that because Congress defines isomers a particular way. Congress defines controlled substances a particular way, and it defines it as substances that are listed in the schedule in the United States Code. It's not what the DEA says, you know, down the line, ethylone plus its isomers, that we haven't made any findings about or specified. It's Congress moving those listed, I'm sorry, those temporary scheduled substances into the code within specific subsections. That's when we know what isomers are controlled, and that's because it's gone through the entire vetting process. Wait, so would your position be different if DEA had scheduled in Schedule I butylone and its optical, positional, and geometric isomers salts and salts of isomers? If they had gone through the process from the beginning and specified that? If they had gone through and given notice to HHS in those terms and gone through and made findings in those terms? As to each and every one of the optical, positional, and geometric isomers and the salts of the isomers? If they had gone through. Does your position have to do with everyone? This is an emergency rulemaking, right? Yes. If you're dealing with designer drugs like Ecstasy, which as I understand it could be made from more than one isomer, and your position is that they've got to do the studies on every genetic mutation, if I could use that, and I'm not a scientist, so bear with me here. If they're going to attach criminal penalties, then they need to know and be specific about what substances. What if they just listed Ethylone? If they had listed Ethylone and made the findings, I wouldn't be here, Your Honor. If they knew what Ethylone really was and if they had sufficient evidence to go through and do these procedures, I think Congress would have probably scheduled it in 2011, but Congress did not schedule Ethylone when given four opportunities to do so because as the government even now still concedes, in the 2018 letter that I filed with the court, there's still a lack of information about Ethylone. Well, as I understand it, the problem that the agency is wrestling with is that we have clandestine chemists out here, and apparently they're really good at tweaking the formulas for this stuff and coming up with really noxious hallucinogens, and the agency is rapidly trying to respond to what's going on in the black market because it's emergency rulemaking authority. So in this instance, why shouldn't we cut the agency some slack here? Because the court holds the agency in this specific area. It holds DEHU a high standard. In hemp industries, the court did not apply Chevron deference because it said, look, the procedure is clear. This is limited authority. And the other thing is that there's a different statute where there's unnamed ice, say unnamed ice or unnamed substance, that is substantially similar in chemical makeup and similar in terms of its dangerous effects on the user. There's an analog statute that's a separate case. Yes. Good morning, Your Honors. As you also know, we have the government. We have the court. Mr. Kelly is challenging the DEH's temporary statute of order, and the DEH followed all the required procedures, pre-temporarily scheduling Betelon in this case, and in the notice, the public notice, as well as the final order itself, it scheduled Betelon and its optical positional deometric isomers. Now, Mr. Kelly does not dispute that Betelon is one such isomer. He's mainly challenging whether or not the DEH had to do specific factor analysis on those separate isomers, but there's nothing in the record to suggest the DEH has to do this. DEH, by definition, if you look back to the Controlled Substances Act, Congress includes isomers by definition based on what type of substance it is, for example, a hallucinogenic or an opioid or an opiate derivative, and in this case, DEH did what it does with whether something is temporarily scheduled or permanently scheduled by saying these isomers are appropriate. So it's not ever by factor analysis to include an isomer. It's simply by definition of what the substance is. One of the problems I had with your position, though, and I think Ms. Choi was getting to it before we moved on to the question, was you've got THC, and as I understand it, that's an isomer that you could produce progesterone, which obviously has a much different purpose than THC. So unless the agency goes through and does the analysis with regard to every isomer, how do we know that all of these isomers are actually worthy of being scheduled as a dangerous drug? Your Honor, the progesterone example is runnery. If you look back, again, it's controlled by definition, so we're not talking about any known types of isomers that might exist out there. We're talking about Congress and the DEH saying when it's this type of substance, then these type of isomers no more. In the definition, there are specific things that have to be met. But I think their argument is that if the government's position is you just articulated it, then you're going to sweep it to prohibited conduct with substances that may contain isomers that are not dangerous, that do not produce hallucinogenic effects, et cetera.  One is that they have to be in the same functional group. Another is that there should be no change in chemical functionality, meaning no new chemical functionality or no destruction of an existing chemical functionality. And so this is the definition that says only those things that are really going to act similarly to and create the same dangerous effects, which is exactly why drug dealers are creating them, because they're trying to find a way around it. And so the definition controls in saying it has to basically be chemically the same thing. So you're not going to sweep it to something like progesterone. Notably, progesterone is not scheduled at all. THC obviously is. THC is a hallucinogenic. In the Controlled Substances Act, it sweeps to these three types of isomers that we're talking about, and it's not progesterone. So just because something is some type of isomer of another thing doesn't mean it's one of these three types that is specifically defined in this drug context. But what is or is not a legally scheduled drug, for sure. Can you address the notice issue? In other words, how does Mr. Kelly, who I found to be a student with a license in pharmaceutical transactions, know that he shouldn't be peddling a cologne in the street corners? With respect to you, would you like me to talk more about whether the notice here was specific or just has to... As far as I'm sure, tax and bill versus the state of Florida, that's sufficient. How does that define it? I'm assuming Mr. Kelly does not have an advanced brain hemisphere. I think that's possibly correct. So how does he have fair notice that what he's doing violates the law? If you look at the Hussain case that the government provided in our recent 28-day letter, it talks about a similar issue. There's not a vagueness issue when there's a sanitary requirement in the statute. You have to be a dealer of drugs to be accountable for dealing drugs. And here we have Mr. Kelly reporting to you. And if you don't know the technical, chemical terms and so on, if you know that you shouldn't be out there selling ecstasy, that's good enough. That's correct, Your Honor. We cited the model of jury instruction in our brief, which talks about to know that you were dealing specifically with substances or, indeed, controlled substances. You don't have to know exactly what it is. Here he might have thought it was an EMA, but he knew what he was doing. He was dealing drugs, and he got in trouble for that. So the sanitary requirement saves that knowledge. And this Court has held previously that if something's published in the Code of Federal Regulations as sufficient notice, it's public, it's out there. And the DA followed all of its required decision-making steps to get it there. What about your bonus flagging evidence to the D.C. Judiciary System that you included the legal agreements, which might turn them into federal criminal justice problems? The DA gave in the letter the notice of attendance that he passed to us. And as Your Honor pointed out, I sort of skimmed over my definition, so HHS knows what's going on here. There's never a separate... I mean, Your Honor, obviously, it just speaks to that. So how do we know if the HHS just enough to get rid of the fact that he was not just interested in all of these substances, but also in their vice versa? So, for example, I keep pointing Your Honor to the permanent scheduling of beating on these other substances. It's happened recently. After this temporary order, I had a time there was a one-year extension, and then as that extension came up on expiration, this was recently in March of this year, fetal load was permanently scheduled. And so if you look at that procedure, it follows the same pattern where it lists the 10 substances. It does, in that case, it's an eight-factor analysis. It does the analysis. But in no case are we saying, and I sort of switched. Here's a list of 50 of them, or however many there are. So if you look at even the permanent scheduling authority, it's following the same procedure that DA followed here. And with regard to where isomers are placed in the temporary scheduling authority, they come into the CFR, the PAB 21 CFR 1308.11, subsection H, specifically. And the reason why DA has to name the substance along with what isomers are included is because subsection H, unlike the other subsections, does not have an introductory subsection that says hallucinogenics. Therefore, these three types of isomers are included. And it couldn't, because H is a catch-all subsection that can change from time to time. As temporary substances come in and expire, you couldn't have a blanket definition of isomer there because you could have, within H, you could have hallucinogenics, you could have opiates, opium derivatives, things like that. And so it wouldn't make sense for DA to have a blanket definition. Instead, what it did was to have item-by-item list, beauty alone, anatomical list, physician alone, geometric, and so forth. And that's how we get around having this bling-bling where, again, it's just commonly recognized you can have these clandestine manufacturers going out and making dangerous tries to get around this. It is, that's correct. It's basically a bath salt. And so it's these products that come on the market that say things like plant food or cleaning product as a software human consumption. They're things your people use are easy to identify. Right, but I think the reason I'm asking that is that I think this conviction of standards, again, holding things for people as properly classed, could cause my names to have a lot of 1C kind of smell to them. And so that's 1C is postnaturals. In the CSA, 21 U.S.C. and solicitation link, in the CFR, it happens to be subsection D because we're talking about two different ways to say how Congress can do it in the 21 U.S.C. DA can do it in the CFR. So it's hallucinogenic in the CFR, personally. And so that's correct to honor it. For example, let's say it was an opiate and it was just in the wrong place. We can have a problem. But it's in the correct place because it's hallucinogenic that has those three types of isomers by definition that come along with it. Okay. Ms. Olson, how much damage would we do to the law if we abide by Ms. Choi's argument here? Because I understand that the substance now has been permanently and theoretically appropriately listed. Correct. So how many other Kelly cases are out there for this period of time during which a temporary listing was in effect? You would, in effect, upend the entire schedule 1 in CFR because factor analysis is never done for isomers. And so if you say that the DA was required to do factor analysis for isomers, you're saying the entire schedule 1 is invalid. And so this would not just be substances that have been paused during scheduling a total of three-year window. We're talking about something significant that is the backbone of how DA schedules substances that by definition will get the appropriate isomers. So it goes well beyond the failure to test ethylene. That's correct. And since ethylene is the isomer, it would not be tested. It would be the substance itself. And DA made those appropriate findings in its public notice of listing the substances and the three types of isomers. And then in its factor analysis, they listed at the beginning, all 10, and isomers. They went through the factor analysis. Mr. Kelly made a point that at the very bottom, there's a conclusion section that looks like there would be the one that was omitted. But the conclusion is not necessary to the factor analysis. The factor analysis is complete, and so the DA did its job here. Okay. Anything further? Ms. Wolk, any questions? No questions. Thank you. I just want to quickly address two points, Your Honor. First, this is not a statute where there are gaps for an agency to fill. This is a brief, short, but mandatory procedure. A temporary scheduling statute lets out its required language and say what the DA shall do, what they shall consider. So it's not like there's room for the DA to, you know, add an I-squared or add a digit. Can you answer or address my colleague's concern? Yes, Your Honor. I want to make sure that if I'm doing a search window, to self-add the name. This is specific as to F-alone. All the court needs to look at is, did the DA do what is required as to F-alone, such that the index is indictment, alleged offense? And it's limited. There's a handful of cases in the entire country that I was able to find that address F-alone. Most of them actually address other substances where people are, you know, in trouble because they have F-alone plus MDMA cocaine and other things. But this case is unique in that it's only F-alone, and he's challenging the temporary scheduling procedures and what the DA did. So I don't think that there is a concern that you're changing the law of the land. The law of the land already exists. And in Caudill, this court's decision in Chester where this court dismissed the indictment because the SORNA regulations weren't followed as to the administrative procedures which was not followed. That's all the court needs to look at. Did the DA follow the procedures as to F-alone? It's not that the indictment cannot stand. Okay. Thank you, Your Honor. Thank you very much. Thank you both. That case was very well argued, and I'm going to leave it at that for discussion.
judges: Gould, Tallman, Watford